Filed 4/21/22; Certified for Partial Pub. 5/17/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CANYON VINEYARD ESTATES I, LLC, | B307176, B308607, B310861 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC128181) |
| v. | |
| JOHN PAUL DeJORIA et al., | |
| Defendants and Respondents. | |

APPEALS from judgments and orders of the Superior Court of Los Angeles County, Mark A. Young, Judge.  Affirmed in part and reversed in part with directions.

Garrett & Tully, Robert Garrett, Ryan C. Squire, Zi C. Lin, Scott B. Mahler; McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Heather L. Richardson, Thomas F. Cochrane, Danielle Hesse and Virginia L. Smith for Defendant and Respondent Mountains Restoration Trust.

Ervin Cohen & Jessup, Peter S. Selvin and Pooja S. Nair for Defendant and Respondent John Paul DeJoria.

Rob Bonta, Attorney General, Tania M. Ibanez, Assistant Attorney General, Joseph N. Zimring, Sandra I. Barrientos and Caroline H. Hughes, Deputy Attorneys General, for Defendant and Respondent California State Attorney General.

Rodrigo A. Castro-Silva, County Counsel, Scott Kuhn, Assistant County Counsel, and Sangkee Peter Lee, Deputy County Counsel, for Defendant and Respondent County of Los Angeles.

_____

Canyon Vineyard Estates I, LLC (CVE) appeals from a grant of summary judgment in favor of Mountains Restoration Trust (MRT), John Paul DeJoria, the County of Los Angeles, and the California State Attorney General. CVE also appeals from an injunction in favor of MRT and from an award of attorney fees and costs in favor of MRT and the Attorney General.

This case concerns over 400 acres of undeveloped land along the Pacific coastline in Malibu. The trial court, in a ruling challenged on appeal by CVE, determined that the land is subject to a conservation easement that prohibits development. The trial court enjoined CVE from violating the easement.

We conclude that there is no genuine issue of material fact that the property is subject to a valid conservation easement and therefore affirm the judgment. However, we conclude that the injunction is overbroad in that it improperly bars CVE from filing further litigation to challenge the conservation easement without regard to the potential merits of a future claim. We therefore reverse the injunction and remand the matter to the trial court to enter a new injunction that is more narrowly tailored so that it

does not enjoin future lawful actions by CVE. We affirm the award of attorney fees and costs.

## BACKGROUND

### A. *Tuna Canyon*

The property at issue on appeal consists of 417 acres of undeveloped land along the southerly slope of the Santa Monica Mountains and the Pacific coastline, located in the City of Malibu and unincorporated areas of Los Angeles County (Tuna Canyon). DeJoria purchased Tuna Canyon in 1990, intending to develop the property into 12 or more 20-acre estates. However, after walking the land, DeJoria changed course and decided to donate Tuna Canyon to preserve it as open space for the enjoyment of the public.

### B. *DeJoria's transfer of Tuna Canyon to MRT*

In 2000, DeJoria approached MRT, a nonprofit land trust dedicated to preserving land in the Santa Monica Mountains, with a proposal to sell and gift Tuna Canyon to MRT. DeJoria and MRT executed a purchase agreement that required Tuna Canyon to "be held as [o]pen [s]pace in [p]erpetuity and that no development of any kind shall take place on the [p]roperty." DeJoria agreed to sell Tuna Canyon to MRT for $1,060,000 and donate the remainder of the appraised value of $13 million as part of the purchase. For his charitable donation, DeJoria received a tax deduction of $11,400,000.

DeJoria executed a grant deed conveying Tuna Canyon to MRT. The grant deed was subject to covenants, conditions, restrictions, reservations, and easements of record. The grant deed required that Tuna Canyon be held "in perpetuity as natural open space" with the exception that the grantee or its successors could "construct[ ] trails, trail heads, erosion control

3

devices[,] and incidental buildings related to the use of the property as natural open space." The grant deed deemed this condition a covenant running with the land and binding upon the real property and any successive owners. If MRT or any of its successors in interest breached the grant deed's use restrictions, DeJoria was entitled to specific performance, injunctive relief, and return of the property. The grant deed also prohibited MRT or any successor in interest from selling or transferring the property for monetary profit or consideration of any type with the exception that, in the event that Tuna Canyon reverted back to DeJoria, he could transfer the property to a governmental agency or another nonprofit and recoup the costs of facilitating the transfer.

### C. *MRT's loan from Centennial*

MRT took out a loan in the amount of $1,060,000 from Centennial Bank (Centennial) that was secured by a deed of trust. Centennial required a subordination agreement that its deed of trust would remain a lien or charge upon the property prior and superior to the deed restrictions, specifically identifying DeJoria's right to termination. Under the subordination agreement, DeJoria waived his rights under the deed restrictions set forth in the grant deed. Thus, if MRT defaulted on the loan, Centennial would be able to foreclose on the property without the risk that its collateral would revert to DeJoria. The grant deed, deed of trust, and subordination agreement were recorded at the same time.

In 2006, Centennial sold the note securing the deed of trust to Southern California Seconds, Inc. (SCS). SCS later initiated foreclosure proceedings when MRT was unable to repay the outstanding balance of the loan. Malibu Horizon Trust

4

purchased the note securing the deed of trust from SCS for approximately $1,300,000. CVE's manager represented Malibu Horizon Trust in connection with the foreclosure and purchase of Tuna Canyon. CVE's manager drafted the foreclosure statement that was provided to potential bidders, which notified them that Tuna Canyon was subject to "significant" deed restrictions, including terms in the grant deed that the land was to be held in perpetuity as natural open space. Malibu Horizon Trust acquired Tuna Canyon at a trustee's nonjudicial foreclosure sale for approximately $1,300,000. CVE purchased Tuna Canyon from Malibu Horizon.

In 2008, CVE entered into preliminary agreements to sell Tuna Canyon to developers. CVE also entertained two offers for approximately $5 million and $7 million from prospective buyers who were interested in preserving Tuna Canyon in its natural open-space condition. However, CVE rejected these offers as too low. In 2016, CVE entered into an exclusive authorization to sell agreement with a company to market and sell Tuna Canyon. The company marketed Tuna Canyon as an opportunity to develop ultra-luxury residential estates situated on several acres of private ocean view land. The marketing materials noted that potential buyers could profit from donating excess land into a conservation easement to reap federal and state tax benefits.

**D.** *Proceedings in the trial court*

In 2017, CVE filed a quiet title action that sought to extinguish the use restrictions contained in the grant deed. CVE moved for judgment on the pleadings. The trial court denied the motion, finding that the grant deed was sufficient to create a conservation easement and that it conveyed two separate interests to MRT—a fee title and a conservation easement. CVE

5

filed a motion for summary judgment on similar grounds, which the trial court denied. The trial court found that the language in the grant deed requiring Tuna Canyon to be held in perpetuity as natural open space was sufficient to create a conservation easement. However, the trial court concluded that there remained triable issues of fact as to whether the parties intended to create a conservation easement and subordinate that easement to Centennial's lien. Thereafter, MRT, the Attorney General, Los Angeles County, and DeJoria filed a joint motion for summary judgment, arguing that there was no triable issues of material fact that the grant deed created a conservation easement that continued to restrict the use of Tuna Canyon for the purpose of keeping the property in its open-space condition in perpetuity.

The trial court granted the summary judgment motion and entered judgment against CVE, leaving the issue of attorney fees and costs to be determined later. After further briefing, the trial court issued a judgment that enjoined CVE from exploring, pursuing, developing, or marketing any uses of Tuna Canyon inconsistent with the terms of the conservation easement. This judgment, too, left attorney fees and costs for later determination. After motions on the fee and cost issues, the trial court awarded MRT $1,371,962.20 in attorney fees and $5,424.55 in costs. The trial court awarded the Attorney General $189,675 in attorney fees and $5,552.88 in costs.

CVE appealed the court's grant of summary judgment, the injunction, and the award of attorney fees and costs.[1]

---

[1] CVE filed three separate appeals, challenging the grant of summary judgment, the injunctive relief, and the award of attorney fees and costs. We consolidated the appeals for purposes of oral argument and decision.

## DISCUSSION

I. **The trial court properly granted summary judgment because a valid conservation easement protects Tuna Canyon.**

A. *Applicable law concerning summary judgment and contract interpretation*

Summary judgment is proper when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

"A defendant who moves for summary judgment bears the initial burden to show the action has no merit—that is, 'one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to [that] cause of action.' [Citation.] Once the defendant meets this initial burden of production, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact. [Citation.] 'From commencement to conclusion, the moving party defendant bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law.' [Citation.] We review the trial court's ruling on a summary judgment motion de novo, liberally construing the evidence in favor of the party opposing the motion and resolving all doubts about the evidence in favor of the opponent. [Citation.] We consider all of the evidence the parties offered in connection with the motion, except that which

7

the court properly excluded." (*Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1292–1293.)

Contract interpretation is a question of law. (*State Farm Fire & Casualty Co. v. Lewis* (1987) 191 Cal.App.3d 960, 963.) We interpret grant deeds under the general rules of contract interpretation. (*Thoryk v. San Diego Gas & Electric Co.* (2014) 225 Cal.App.4th 386, 397.) "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; Civ. Code,[2] § 1636.) When language in a contract is clear and explicit, that language governs interpretation. (§ 1638.) "When an instrument is susceptible to two interpretations, the court should give the construction that will make the instrument lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the instrument extraordinary, harsh, unjust, inequitable or which would result in absurdity." (*Ticor Title Ins. Co. v. Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730.) " 'Extrinsic evidence is "admissible to interpret the instrument, but not to give it a meaning to which it is not susceptible." ' " (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238.)

### B. *Defendants met their burden to show that the grant deed created a conservation easement.*

MRT asserts that the plain language of the grant deed demonstrates that DeJoria conveyed a conservation easement to MRT. We agree.

---

[2] All further undesignated statutory references are to the Civil Code.

8

A " 'conservation easement' " is "any limitation in a deed, will, or other instrument in the form of an easement, restriction, covenant, or condition, which is or has been executed by or on behalf of the owner of the land subject to such easement and is binding upon successive owners of such land, and the purpose of which is to retain land predominantly in its natural, scenic, historical, agricultural, forested, or open-space condition." (§ 815.1.)  Conservation easements are "perpetual in duration" (§ 815.2, subd. (b)) and may only be acquired and held by "tax-exempt nonprofit organization[s] qualified under Section 501, [subdivision] (c)[(3)] of the Internal Revenue Code" (§ 815.3, subd. (a)); local government entities; or Native American tribes (§ 815.3, subds. (b), (c)).

In enacting California's conservation easement statutory scheme, the Legislature declared that "the preservation of land in its natural, scenic, agricultural, historical, forested, or open-space condition is among the most important environmental assets of California."  (§ 815.)  To protect this invaluable asset and to preserve its natural open spaces, courts liberally construe conservation easement laws to encourage the voluntary conveyance of conservation easements to qualified entities. (§ 816.)  If a conservation easement holder is the prevailing party, courts may order injunctive relief and award money damages and attorney fees.  (§ 815.7, subds. (b), (c).)

The grant deed from DeJoria to MRT explicitly creates a conservation easement under the legal definition.  The first paragraph of the grant deed states that Tuna Canyon "shall be held in perpetuity as natural open space."  Only minimal development is permitted, and it is limited to the construction of "trails, trail heads, erosion control devices[,] and incidental

9

buildings related to the use of the property as natural open space." Thus, it is clear that the grant deed's language is a limitation on land the purpose of which is to retain Tuna Canyon predominantly in its natural, scenic, or open-space condition. (See § 815.1.) The restriction was perpetual in nature. The grant deed makes this clear in its first paragraph, which states that Tuna Canyon will be held as open land "in perpetuity" and in its final paragraph, which states that the restrictions "shall be deemed to be covenants running with the land, binding upon the real property and each successive owner thereof." The grant deed further restricted MRT and its successors in interest, including DeJoria, from selling or transferring the land for monetary profit or consideration. It was also executed by DeJoria, the owner of the land, and conveyed to MRT, an entity legally qualified to acquire and hold a conservation easement. (See § 815.3.)

Accordingly, the plain language of the grant deed meets the statutory definition of a conservation easement and supports the conclusion that DeJoria and MRT intended to create such an easement restricting the use of Tuna Canyon in perpetuity. Thus, the burden shifts to CVE to show that there is a triable issue of material fact as to whether Tuna Canyon is not subject to the conservation easement. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 845.)

C. ***CVE has not demonstrated a triable issue of fact as to whether Tuna Canyon remains subject to a conservation easement held by MRT.***

CVE advances several arguments that either MRT and DeJoria failed to create a conservation easement at the time of the conveyance or, alternatively, that the subsequent foreclosure

10

extinguished any easement.  We do not agree with CVE's arguments.

### 1. Grant of a fee title subject to a condition subsequent did not preclude the grant of a conservation easement.

CVE argues that the plain language of the grant deed shows that DeJoria did not convey an easement to MRT.  Rather, to convey an easement to MRT, DeJoria needed to transfer something less than fee title and, if DeJoria conveyed anything to MRT, it was fee title subject to a condition subsequent with the power of termination.

CVE directs us to the fact that the grant deed did not contain the word "easement" or any express provision for who would own and hold such an easement.  It is true that the grant deed does not expressly refer to an easement.  However, there is no requirement that the word "easement" must appear in a deed to create such an interest.  (See *City of Manhattan Beach v. Superior Court*, *supra*, 13 Cal.4th at p. 235.)  The label of a particular interest or lack of formal words of conveyance are not determinative of the scope of the interest conveyed.  (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 35–36.) "Ultimately, the label given to [grantee]'s 'interest' is of little importance.  Arrangements between landowners and those who conduct commercial operations upon their land are so varied that it is increasingly difficult and correspondingly irrelevant to attempt to pigeonhole these relationships as 'leases,' 'easements,' 'licenses,' 'profits,' or some other obscure interest in land devised by the common law in far simpler times." (*Id*. at p. 36.)  Each instrument must be considered individually, keeping in mind

11

"interpretive touchstone" of "the parties' intent." (*City of Manhattan Beach*, at p. 243.)

Although the use restriction in the grant deed was not labeled a conservation easement, it nonetheless met the statutory definition of a conservation easement under section 815.1 as a limitation in a deed that restricted the use of Tuna Canyon by MRT and successive owners to retain the land predominantly in its natural or open-space condition. (See *Building Industry Assn. of Central California v. County of Stanislaus* (2010) 190 Cal.App.4th 582, 595 [instrument need not reference California's conservation easement law to convey a conservation easement].) Moreover, even if the language in the grant deed were ambiguous as to whether DeJoria and MRT intended to preserve Tuna Canyon as natural open space in perpetuity through a conservation easement, the extrinsic evidence is overwhelming that the parties intended just that. (*City of Manhattan Beach v. Superior Court*, *supra*, 13 Cal.4th at p. 238 [primary goal of contract interpretation is to carry out intention of parties].) DeJoria testified that he donated Tuna Canyon for the sole purpose of preserving the land in its natural state as open space in perpetuity as "a gift to the people— something . . . families could enjoy together forever." "My intention was to transfer the land for the use of the people, period, not to be developed in any way, shape or form, to be transferred to the use of the people forever." To accomplish his goal that Tuna Canyon was "not to be developed," DeJoria sought out and conveyed Tuna Canyon to MRT, an entity whose purpose is to preserve natural open spaces in the Santa Monica Mountains and that is qualified under California law to acquire and hold a conservation easement. Further, had DeJoria

12

exercised his power of termination, he was still prohibited from selling the land for any monetary profit or consideration and limited to transferring Tuna Canyon to a government entity or another nonprofit corporation.  Reading the terms of the grant deed together, it unambiguously granted MRT a conservation easement in Tuna Canyon that was perpetual and would encumber the property even if the fee title was forfeited.

CVE cites to several cases to argue that a conservation easement can only be created where the fee owner conveys something less than fee title to the conservation easement holder. We find these authorities inapposite as they did not address whether a deed conveyed a conservation easement or whether a fee title and conservation easement could be conveyed in the same transaction.  (*Concord & Bay Point Land Co. v. City of Concord* (1991) 229 Cal.App.3d 289 [deed included condition that strip of land be used as railroad right-of-way conveyed fee title subject to condition subsequent, not an easement]; *Wooster v. Department of Fish & Game* (2012) 211 Cal.App.4th 1020 [public entity's failure to post signs as condition of holding conservation easement did not require forfeiture of easement]; *Johnston v. Sonoma County Agricultural Preservation & Open Space Dist.* (2002) 100 Cal.App.4th 973 [conservation easement restricted local government from using eminent domain to build water pipeline through property].)

CVE also relies on *City of Palm Springs v. Living Desert Reserve* (1999) 70 Cal.App.4th 613.  In that case, a foundation conveyed land to the city in a grant deed that required the city and its successors in interest to use the land as a desert preserve forever.  If the use restriction was breached, the city's interest in the land would pass to a public benefit corporation.  (*Id.* at

13

pp. 617–618.)  The city accepted the grant but decided that it would rather build a golf course on the land.  (*Id*. at p. 618.)  The corporation rejected the city's offer to purchase its reversionary interest in the land.  The city filed an action in eminent domain.  The trial court granted the city's eminent domain action and issued an order for immediate possession.  (*Ibid*.)  The corporation appealed, and the Attorney General appeared as an amicus curiae.  (*Id*. at p. 619.)  The Attorney General argued that the land was given to the city as a charitable trust and the trial court lacked jurisdiction to terminate the trust.  (*Id*. at pp. 619–620.)  The Court of Appeal concluded that the deed granted the city fee title subject to a condition subsequent, the grantor's power to terminate, and did not create a charitable trust.  (*Id*. at p. 622.)

*City of Palm Springs v. Living Desert Reserve* (1999) 70 Cal.App.4th 613 is inapposite.  Although the case involved the conveyance of land for the purpose of preserving it as open space, it did not involve the issue of whether the land was subject to a conservation easement.  The case did not address easements at all and did not discuss the statutory scheme governing conservation easements or any case law related to those statutes.  Instead, it analyzed case law relating to charitable trusts.  Nor does the case stand for the proposition that an instrument cannot simultaneously grant a conservation easement and fee title subject to a condition subsequent.  The primary issue in *City of Palm Springs* was whether the city had to compensate a party when it took possession of a reversionary interest in land through eminent domain, an issue far afield from the one presented here.  (*Id*. at p. 619.)  *City of Palm Springs*, at pages 621 and 622, also determined whether a gift with a charitable purpose could

14

constitute something other than a charitable trust where the donor clearly intended to make a conditional gift. Neither of these issues are relevant to the case at bar.

We conclude that regardless of whether DeJoria conveyed to MRT fee title subject to a condition subsequent, this did not preclude him from transferring a conservation easement as well.

### 2. The conservation easement did not merge into the fee estate.

CVE argues that, if DeJoria granted both a fee title and a conservation easement to MRT, then that easement was extinguished the moment of its creation under the doctrine of merger.

The merger doctrine on which CVE relies is codified by sections 805 and 811. Section 811 provides, "A servitude is extinguished: [¶] 1. By the vesting of the right to the servitude and the right to the servient tenement in the same person"; while section 805 provides: "A servitude thereon cannot be held by the owner of the servient tenement." Because an easement is the right to use or prevent the use of the land of another, a person cannot have an easement on his or her own land. (*Wilson v. Pacific Electric Ry. Co.* (1917) 176 Cal. 248, 254.) The rationale for the merger doctrine is "to avoid nonsensical easements—where they are without doubt unnecessary because the owner owns the estate." (*Beyer v. Tahoe Sands Resort* (2005) 129 Cal.App.4th 1458, 1475.)

The merger doctrine may apply in a typical case, for example, where a landowner first grants another party an easement to cross the property, and later sells the same property to the easement holder. Because the easement has now become nothing more than a right by the new owner to cross his or her

own land, the easement's existence no longer makes sense, and it merges into the new owner's more comprehensive ownership rights.  (See *Beyer v. Tahoe Sands Resort*, *supra*, 129 Cal.App.4th at p. 1475.)

However, "merger does not always follow the union of a greater and lesser estate in the same ownership.  The question is one of intention, actual or presumed, of the person in whom the interests are united."  (*Ito v. Schiller* (1931) 213 Cal. 632, 635.) Further, " '[e]quity will prevent or permit a merger, as will best subserve the purposes of justice, and the actual and just intent of the parties.' "  (*Ibid.*)  " 'In the absence of an expression of intention, if the interest of the person in whom the several estates have united, as shown from all the circumstances, would be best subserved by keeping them separate, the intent so to do will ordinarily be implied.' "  (*Ibid.*)

Unlike a typical case involving the merger of an easement, the merger of MRT's fee title in Tuna Canyon and its conservation easement would do violence to the parties' intent and serve no purpose.  First, merging MRT's interests would contravene the primary purpose of the transfer of Tuna Canyon from DeJoria, which was to preserve the land in its open-space condition in perpetuity.  Second, a merger would frustrate the purpose of California's conservation easement laws, which seek to encourage the donation of land for the purpose of preserving it as open space, which the Legislature has declared to be among the most important environmental assets of California.  (See § 815.) Third, applying the merger doctrine would not avoid nonsensical easements.  To the contrary, the conservation easement here remains necessary to ensure the preservation of Tuna Canyon in

16

its natural condition despite its location in a highly desirable area along Southern California's Pacific coastline.

CVE's attempt to rely on the merger doctrine conflates conservation easements with general easements or general servitudes. CVE's incorrect equivalency disregards the Legislature's creation of a separate statutory scheme governing conservation easements, which expressly makes them perpetual in duration. In contrast, the statutes governing ordinary servitudes expressly provide that they are subject to the merger doctrine and may be extinguished "[b]y the vesting of the right to the servitude and the right to the servient tenement in the same person." (§ 811; cf. § 816.54, subd. (b) [a "greenway easement shall be perpetual in duration"].)

Accordingly, we conclude that MRT's fee title and conservation easement did not merge. Nor has CVE met its burden to show a triable issue of fact on this issue.

### 3. DeJoria's power of termination did not prevent the creation of a conservation easement.

By statute, as we have discussed above, conservation easements must be perpetual in duration. CVE contends that—notwithstanding the language in the grant deed stating that the use restrictions are perpetual in duration—the use restrictions were not perpetual because DeJoria retained the power to terminate those restrictions

The premise of CVE's argument is incorrect: contrary to CVE's interpretation, the forfeiture clause did not give DeJoria the right to terminate the use restriction. "A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created." (§ 1442.) "[R]ules of construction

17

require a much stricter interpretation against the grantee of a condition subsequent involving a forfeiture than of an easement." (*Tamalpais Land & Water Co. v. Northwestern Pac. R.R. Co.* (1946) 73 Cal.App.2d 917, 929.)  Even where a deed contains language that is normally used to grant a fee, and contains a reversionary clause, courts will construe the instrument as granting an easement if doing so would be consistent with the purpose of the conveyance.  (*Ibid.*)  In contrast, we must liberally construe the statutory scheme governing conservation easements to effectuate the Legislature's purpose of encouraging individuals to voluntarily convey such interests to preserve California's natural open spaces.  (§§ 815, 816.)

CVE's argument that DeJoria had the power to terminate the use restriction is inconsistent with these principles. Construing the forfeiture clause against DeJoria and liberally construing those terms that create a conservation easement, the grant deed conveys two separate interests, a fee title that would be forfeited if the use restrictions were violated and a conservation easement that remained with MRT as a qualified holder.  (See § 1641 [contract must be considered as a whole with each clause helping to interpret the others].)  Thus, even if DeJoria's power of termination was triggered by some future event, that would mean that interest in the property would revert to DeJoria still subject to the use restriction.  The conservation easement would endure.

4.    **The subordination agreement did not prevent the creation of a conservation easement.**

CVE also argues that no perpetual use restriction—and thus no conservation easement—arose because of the terms of the

18

parties' subordination agreement. According to CVE, the parties agreed in the subordination agreement that the use restrictions requiring Tuna Canyon to be kept in its natural state in perpetuity would be extinguished upon foreclosure of the property.

CVE's contention again proceeds from an incorrect premise: contrary to CVE's argument, the subordination agreement did not grant any party, including Centennial upon foreclosure, the right to nullify the use restrictions. While both DeJoria and MRT signed the subordination agreement, the agreement is structured and written to subordinate DeJoria's rights—not MRT's—to Centennial's lien. The subordination agreement makes clear that it is concerned with ensuring that Dejoria's right to recover title is subordinated to Centennial's ability to enforce its lien. Thus, in the first paragraph, the subordination agreement states that the grant deed contained "Deed Restrictions" and further explains "which Deed Restrictions, inter alia, reserve to [DeJoria] the right to recover title to the Real Property in the event that [MRT] violates the use restrictions set forth in paragraph 1 of the Deed Restrictions."

The subordination agreement thereafter concerns itself only with the "Deed Restrictions," which it has discussed as DeJoria's right to terminate if MRT violates the use restriction. The subordination agreement has only DeJoria, and not MRT, specifically declare that he "relinquishes and subordinates" his rights under the "Deed Restrictions." There is no parallel operative language where MRT does the same. Nor is there any language stating that the use restrictions promising to hold Tuna Canyon as open land in perpetuity is subordinated to or extinguished by Centennial's lien.

19

Further, the intent of Centennial in obtaining the subordination agreement was to ensure that it could recover the amount owed by MRT on the loan in the event of default. To accomplish this goal, the agreement needed only to subordinate DeJoria's right of termination, not MRT's rights to enforce a conservation easement. Indeed, the unencumbered property was worth significantly more than Centennial's loan amount. Centennial's representative testified that the use restriction that Tuna Canyon remain as open space would not have been an issue for Centennial when it made the loan and that the purpose of the subordination agreement was to ensure Centennial was in a "first-lien position."

CVE attempts to interpret the subordination agreement to mean that the use restrictions that the grant deed defined as "perpetual" were not meant to be perpetual, and that the term in the grant deed that this restriction would apply to every subsequent owner did not actually apply to Centennial or its successors. If that were the case, one would have expected to find express language subordinating the land use restrictions to Centennial's lien rights. But there is no such language. CVE attempts to rely on the phrase "inter alia," Latin for "[a]mong other things" (Black's Law Dict. (6th ed. 1990) p. 811, col. 1), in the discussion of the "Deed Restrictions" to mean that the subordination agreement must have been concerned with restrictions besides the right of DeJoria to recover the property. This does not follow. The phrase "inter alia" is careful lawyerly language ensuring that the full scope of DeJoria's rights is subordinated. For example, it eliminates ambiguity about whether DeJoria's entire right to "forfeiture and return of the Property" (the language set forth in the grant deed) is

20

encompassed in the subordination agreement's shorthand reference to DeJoria's "right to recover title." Moreover, CVE attempts to rely on the subordination agreement's reference to the "use restrictions set forth in paragraph 1 of the Deed Restrictions." But the subordination agreement references this only to explain that it is their violation that serves as a condition that allows DeJoria to recover the property.

A Latin phrase and a passing reference do not undo the specific language of the grant deed under which the property is held in perpetuity for the benefit of the public. Interpreting the subordination agreement and grant deed together demonstrates that it was DeJoria's right to termination that was subordinated to Centennial's deed of trust.

Conversely, CVE also argues that, if MRT and DeJoria intended for the conservation easement to be perpetual, they were required to obtain an agreement from Centennial to subordinate its mortgage rights to the easement. CVE cites to several federal cases that enforced a federal regulation stating that a taxpayer could not claim a charitable contribution deduction based on the conveyance of a conservation easement if it was not subordinated to a mortgage at the time of the donation. (*Mitchell v. Commissioner of Internal Revenue* (10th Cir. 2015) 775 F.3d 1243, 1246 (*Mitchell*); *Minnick v. Commissioner of Internal Revenue* (9th Cir. 2015) 796 F.3d 1156, 1157 (*Minnick*); *RP Golf v. Commissioner of Internal Revenue* (8th Cir. 2017) 860 F.3d 1096, 1100 (*RP Golf*).)

These cases are not persuasive. Each involved enforcement of a particular federal regulation relating to a taxpayer's eligibility for a charitable deduction for land donations. (See *Mitchell*, *supra*, 775 F.3d at p. 1248 [considering whether federal

21

regulation was arbitrary and capricious or contrary to federal statute]; *RP Golf, supra*, 860 F.3d at p. 1099 [same]; *Minnick, supra*, 796 F.3d at pp. 1159–1160 [deferring to Internal Revenue Service's interpretation of regulation].) Tax deductions are considered acts of legislative grace and are strictly construed against the taxpayer. (*Minnick*, at p. 1159.) Courts will defer to the Commissioner of Internal Revenue's interpretation of its own code, including its application of a bright line rule to determine whether the conveyance of a conservation easement qualifies as a charitable contribution for purposes of a deduction. (*Id.* at pp. 1159–1160.)

These cases do not purport to interpret California law, including our Legislature's express directive that the law of conservation easements should be construed liberally to encourage their creation and voluntary conveyance by landowners. (§ 816.) These cases do not affect the result here.

### D. *Public policy considerations do not warrant a different result.*

CVE asserts that public policy "compels enforcing the plain meaning of recorded documents so they can faithfully be relied on, in order to promote and preserve the stability, predictability, and free transferability of real property." While this statement is noncontroversial as far as it goes, it does not militate in favor of any different result.

First, while CVE champions certain policies, it ignores others. CVE ignores the fundamental principle that an agreement must be interpreted to give effect to the mutual intention of the parties. The manifest intent of DeJoria and MRT was to preserve Tuna Canyon in its natural open-space condition in perpetuity. CVE also overlooks California's interest in

22

preserving land in its natural open-space conditions and encouraging conservation easements.

More fundamentally, it is CVE whose arguments conflict with the interests of stability and predictability. CVE's interpretations of the operative documents here, if accepted, would grant CVE an unexpected real estate windfall through the purchase for development of over 400 acres of prime coastland for well under $2,000,000, a price that reflects the prohibition on development. Moreover, CVE cannot claim that the result here is unpredictable when CVE's manager warned other potential bidders at the foreclosure sale, after reviewing the operative documents, of terms in the grant deed that Tuna Canyon "shall be held in perpetuity as natural open space" which "shall be deemed a covenants running with the land, binding upon the real property and each successive owner." Moreover, CVE's interpretation would deprive taxpayers, who have already paid for Tuna Canyon to remain as natural open space by subsidizing DeJoria's nearly $12 million tax deduction, of the benefits they obtained. Indeed, adopting CVE's interpretation could result in taxpayers paying twice to protect the same land as Tuna Canyon has already been marketed as an opportunity to potential purchasers to donate excess land for a conservation easement to obtain tax benefits.[3]

---

[3] CVE's purported solution to this problem is to make DeJoria pay the taxes now. However, that would contradict the principle on which CVE relies—the stability and predictability of real property transactions—as DeJoria would be assessed a tax bill from a real property transaction that occurred nearly 20 years ago in which he donated land for public enjoyment only

23

We conclude that MRT has established that there is no dispute of material facts that MRT owns a conservation easement over Tuna Canyon and the trial court properly granted summary judgment in favor of respondents.[4]

## II. The trial court must ensure the injunction does not preclude CVE from exercising its right to seek relief in court

CVE also contends that the trial court's injunction is overbroad. Among other things, the injunction states in relevant part that CVE is enjoined from "exploring, pursuing, developing, or marketing any uses" of the property inconsistent with and in violation of the conservation easement's terms including "taking legal steps to rezone the [property] and/or extinguish the conservation easement encumbering it; and . . . filing new litigation to extinguish the conservation easement encumbering" the property. CVE argues that this injunction, as phrased, is unconstitutionally vague and overbroad and constitutes a prior restraint. We agree with CVE as to portions of the injunction.

---

to find out later he must subsidize an unrelated third party's attempts to develop the land.

[4] CVE requested judicial notice of legislative history reports and analyses of Assembly Bill No. 1011 and Senate Bill No. 1360, as well as the Internal Revenue Service's 2020 instructions for schedule D. Because legislative materials and instructions provided by the Internal Revenue Service are generally proper subjects for judicial notice, we grant the requests. (See *Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1187, fn. 3 [legislative histories]; *Eith v. Ketelhut* (2018) 31 Cal.App.5th 1, 7 [Internal Revenue Service instructions].) However, nothing in these materials changes our analysis.

An injunction that forbids speech before it has occurred is a " 'prior restraint.' " (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 886.)  Prior restraints are highly disfavored and presumptively violate the First Amendment. (*Maggi v. Superior Court* (2004) 119 Cal.App.4th 1218, 1225.)  A permissible prior restraint must be narrowly tailored so as not to infringe on constitutionally protected activity. (*Evans v. Evans* (2008) 162 Cal.App.4th 1157, 1167.)  An injunction that interferes with an individual's right to petition by, for example, enjoining him or her from presenting claims to government officials or engaging in future litigation, may constitute an invalid prior restraint. (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1160–1161.)  Further, an injunction is unconstitutionally vague and overbroad if it does not clearly define the persons protected and the conduct prohibited and restricts lawful as well as unlawful activity. (*California Retail Liquor Dealers Institute v. United Farm Workers* (1976) 57 Cal.App.3d 606, 610.)

We review the trial court's decision to grant an injunction for abuse of discretion. (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.)  The burden is on the party challenging the injunction to demonstrate the injunction exceeds the bounds of reason. (*Clear Lake Riviera Community Assn. v. Cramer* (2010) 182 Cal.App.4th 459, 471.)  To establish an abuse, the challenging party must show that there is no reasonable basis for the trial court's decision. (*Antelope Valley Groundwater Cases* (2018) 30 Cal.App.5th 602, 615.)  We afford considerable deference to the trial court and presume that it properly applied the law and acted within its discretion unless the appellant

25

affirmatively shows otherwise.  (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 378.)

CVE contends that the bar on litigation is improper as it enjoins CVE from exercising its right to free speech and petition where existing legal doctrines such as issue and claim preclusion would not bar CVE from doing so.  We find that CVE's concerns have merit.  The injunction seems to bar any future legal action that CVE could take with respect to the conservation easement even if those theoretical future legal actions were not barred by issue and claim preclusion.  As the holder of the conservation easement, MRT may of course enforce its rights against CVE or any subsequent owner of Tuna Canyon.  However, by banning any future litigation by CVE regarding the conservation easement, the broad language of the injunction goes far beyond that.  For example, although MRT asserts that the injunction would not prevent CVE from initiating *cy pres* proceedings to extinguish or modify the easement, the injunction's language by its terms is broad enough to include such actions.  Thus, there does not seem to be any legal remedy that CVE can pursue with respect to its rights, if any, related to the conservation easement.

The injunction is also overbroad in one other respect:  it purports to prohibit CVE from "exploring" uses of the property inconsistent with the easement.  This term is not defined, and it is not clear what the language prohibits.  It thus runs afoul of the rule that an injunction must clearly define prohibited conduct.  (*Evans v. Evans, supra*, 162 Cal.App.4th at p. 1167.)

CVE raises several other objections to the terms of the injunction, such as a concern that the injunction would prohibit CVE from negotiating with MRT or the State about the conservation easement.  We find these concerns speculative and

26

without merit.  The remaining terms of the injunction properly enjoin "[a]ctual or threatened injury to or impairment of a conservation easement or actual or threatened violation of its terms."  (§ 815.7, subd. (b).)  They do not violate any constitutional prohibitions.

Accordingly, we conclude that portion of the injunction that enjoins CVE from filing new litigation or from "exploring" options is unconstitutionally overbroad.  Except with respect to those issues, the injunction is legally appropriate.

## III.   The award of attorney fees and costs is appropriate.

CVE separately appealed the orders awarding attorney fees and costs.  CVE argues that these fee and cost orders should be reversed because the trial judge's summary judgment and injunction judgments should be reversed.

Generally, an "order awarding costs falls with a reversal of the judgment on which it is based."  (*Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402.)  "But where, as here, there is a *limited* reversal, we remand for the trial court to consider anew the propriety of attorney fees *unless* we can say with certainty the court would have exercised its discretion the same way had the successful party not prevailed on the issue on which we reverse."  (*Boatworks, LLC v. City of Alameda* (2019) 35 Cal.App.5th 290, 307.)

Here, our reversal is limited to the overbroad language in the injunction.  It leaves intact the trial court's ruling on the merits and the other injunction terms.  MRT and the Attorney General have prevailed on the central issue in the case—whether Tuna Canyon was subject to a conservation easement held by MRT.  They have successfully enforced the conservation easement against CVE and are entitled to an injunction in

27

accordance with our ruling.  Thus, our opinion does not change the fact that MRT and the Attorney General are the prevailing parties under section 815.7.  Under these circumstances, we are confident the trial court's ruling as to attorney fees and costs would not change as a result of our ruling on the scope of the injunction.

Accordingly, we affirm the attorney fee awards.  (See § 815.7 [entitling prevailing part in any action under conservation easement statutes an award of attorney fees].)

## DISPOSITION

The summary judgment is affirmed.  The judgment granting the injunction is reversed and the trial court is directed to enter a new injunction that is narrowly tailored to permit Canyon Vineyard Estates I, LLC to pursue available legal remedies, if any, with respect to the conservation easement and that does not prohibit exploration of its options.  The orders granting attorney fees and costs are affirmed.  Mountains Restoration Trust, John Paul DeJoria, the County of Los Angeles, and the California Attorney General are awarded their costs on appeal.


LIPNER, J.*

We concur:


EDMON, P. J.          LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 5/17/22

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| CANYON VINEYARD ESTATES I, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>JOHN PAUL DeJORIA et al.,<br><br>    Defendants and Respondents. | B307176<br>(Los Angeles County<br>Super. Ct. No. SC128181)<br><br>CERTIFICATION AND ORDER FOR PARTIAL PUBLICATION |
| CANYON VINEYARD ESTATES I, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>MOUNTAINS RESTORATION TRUST,<br><br>    Defendant and Respondent. | B308607 |

---

    * Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

| CANYON VINEYARD ESTATES I, LLC, | B310861 |
| Plaintiff and Appellant, | |
| v. | |
| MOUNTAINS RESTORATION TRUST et al., | |
| Defendants and Respondents. | |

The opinion in the above-entitled matter filed April 21, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be partially published in the Official Reports and it is so ordered.


LIPNER, J.*            EDMON, P. J.            LAVIN, J.

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.